UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| TONI L. TRIPP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 2:14-CV-80-SPM |
| | ) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the applications of Plaintiff Toni L. Tripp ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 7). Because I find the decision denying benefits was supported by substantial evidence, I will affirm the Commissioner's denial of Plaintiff's application.

I. **FACTUAL BACKGROUND**

At the hearing before the Administrative Law Judge ("ALJ") on January 8, 2013, Plaintiff, a twenty-seven-year-old female, testified that she lived with her fiancé and three children, aged seven, six and five. (Tr. 37-38). She has a high school education, but stopped participating in an online college program because of difficulties with the material. (Tr. 39-40).

1

Plaintiff last worked in January 2008. (Tr. 42). She stated that she ceased working due to a knee injury, which causes her knees to "cave in" or "pop out of joint" if she stands for longer than an hour. (Tr. 42, 47). Plaintiff testified that other factors contributing to her inability to work were her poor comprehension, lack of work experience, poor interpersonal skills, post-traumatic stress disorder ("PTSD"), anxiety, and depression. (Tr. 42). Her PTSD and anxiety are the result of sexual abuse. (Tr. 43). She reported that, due to her PTSD, she will not go out in public by herself, nor will she stay at home without another adult. (Tr. 43). Plaintiff testified that she panics when in large crowds and has pseudoseizures when her anxiety and stress levels get high. (Tr. 43). She also has difficulties sleeping because of night terrors, for which she takes sleeping medication. (Tr. 56-57). Plaintiff further stated that she suffers from flashbacks that can last for an hour. (Tr. 58).

On a typical day, Plaintiff gets her kids ready for school, which entails bathing them, brushing their hair, dressing them, and feeding them breakfast. (Tr. 51-52). She then goes back to sleep until 11 A.M. (Tr. 51). Later, she does laundry and dishes, cleans the bathrooms, and vacuums twice a week. (Tr. 51). She uses a computer once in a while to check Facebook, email, and her kids' grades. (Tr. 53). When she needs to shop, Plaintiff generally gets a ride from a friend to Wal-Mart and is accompanied by her fiancé. (Tr. 53).

Plaintiff's medical records reveal that she was diagnosed with pseudoseizures[1] and PTSD in July 2010. (Tr. 309, 318). She has had four documented pseudoseizures. (Tr. 277, 295, 309, 409). She began seeing a psychiatrist, Dr. Richard Bowers, in April 2011; Dr. Bowers diagnosed her with "depressive disorder, not otherwise specified," PTSD, and generalized anxiety disorder.

---

[1] The Discharge Summary and Admission Notes from Plaintiff's initial emergency room visit for her pseudoseizures describe them as non-epileptic seizures characterized by loss of consciousness, "jerky movements in all four extremities with her eyes open, no tongue biting, [and] no urinary incontinence." (Tr. 309, 318).

(Tr. 403). Plaintiff saw Dr. Bowers a total of six times between April 2011 and her ALJ hearing. (Tr. 401, 398, 392, 452, 459, 467). Between February 2012 and November 2012, she did not see Dr. Bowers at all, purportedly due to an inability to arrange transportation. (Tr. 45). She also briefly engaged in individual therapy with an intern at the Lighthouse Counseling Center at the end of 2012. (Tr. 45-46, 500). Plaintiff has been prescribed antidepressants since July 2010 (Tr. 311, 294, 403, 393, 454, 460, 468), and sleep medications since April 2011 (Tr. 403, 399, 393, 454, 460, 468).

The record contains a Medical Source Statement ("MSS") from Dr. Bowers, Plaintiff's treating psychiatrist, in which he opined that Plaintiff has "no useful ability" to deal with the public or work stresses, to maintain attention/concentration, to maintain personal appearance, or to relate predictably in social situations. (Tr. 457-58). The record also contains a Mental Residual Functional Capacity Assessment from Dr. Keith Allen, a non-examining state psychological consultant, who found that Plaintiff was "moderately limited" in her ability to carry out detailed instructions, interact appropriately with the public, and respond appropriately to changes in the work setting, but had no other significant limitations. (Tr. 448-49).

## II. PROCEDURAL BACKGROUND

On June 22, 2011, Plaintiff applied for DIB, and on June 27, 2011, Plaintiff applied for SSI. (Tr. 141-48). Plaintiff alleged that she had been unable to work since January 25, 2009 due to a bad knee, seizures, depression, and PTSD. (Tr. 141, 143, 197).[2] Her application was initially denied. (Tr. 75). On November 21, 2011 Plaintiff filed a Request for Hearing by ALJ. (Tr. 88-89). On January 8, 2013 Plaintiff amended her alleged onset date to July 19, 2010. (Tr. 37, 172).

---

[2] Because Plaintiff's argument on appeal concerns only Dr. Bowers' opinion regarding her mental abilities, the Court will focus primarily on those records that address her mental abilities.

After a hearing, the ALJ issued an unfavorable decision on March 18, 2013. (Tr. 11-25). On April 15, 2013, Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council. (Tr. 32). The Appeals Council declined to review the case on June 3, 2014. (Tr. 1-7). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

### III. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then

4

he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the final step. *McCoy*, 648 F.3d at 611. At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to

other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

### IV. THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff had not engaged in substantial gainful activity since July 19, 2010 (the amended alleged onset date); that Plaintiff had the severe impairments of pseudoseizures, depression, anxiety, PTSD, and bilateral knee disorder with tilting of the patellae; and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-14). The ALJ found that Plaintiff had the RFC to perform medium work, but with the following limitations: she "can stand or walk six hours total in an eight-hour workday; can sit for six hours total in an eight-hour workday; can never climb ladders, ropes, or scaffolds; can never work at unprotected height or around hazardous machinery; [is] limited to simple, routine, and repetitive tasks; can make simple work-related decisions; [is] limited to only occasional superficial, non-negotiation types of interactions with co-workers or supervisors; can never work with the general public; and needs to be able to change positions between sitting, standing, or walking every hour at the workstation for up to five minutes." (Tr. 17). The ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 23). However, based on the testimony of a vocational expert, the

ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 24).

V. **DISCUSSION**

Plaintiff argues that the ALJ's decision should be reversed because the ALJ failed to properly analyze the MSS of Dr. Bowers, Plaintiff's treating psychiatrist. Specifically, Plaintiff argues that (1) Dr. Bowers' opinion should have been given controlling weight; and (2) even if Dr. Bowers' opinion was not entitled to controlling weight, the ALJ erred by giving it "little weight" and by failing to consider the required factors of 20 C.F.R. § 404.1527(c) in making that decision.

A. **Standard for Judicial Review**

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent

7

positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's Assessment of Dr. Bowers' Opinion is Supported by Substantial Evidence

On February 16, 2012, Dr. Bowers, Plaintiff's treating psychiatrist, provided an MSS in which he opined that Plaintiff had a "good" ability to follow work rules; a "fair" ability to relate to co-workers, use judgment, interact with supervisors, function independently, understand, remember and carry out complex, detailed, and simple job instructions, behave in an emotionally stable manner, and demonstrate reliability; and a "poor" ability to deal with the public, deal with work stresses, maintain attention/concentration, maintain personal appearance, and relate predictably in social situations. (Tr. 457-58). A "poor" rating signifies "[n]o useful ability to function in this area." (Tr. 457). Dr. Bowers left blank each space on the form that asked him to "[d]escribe any limitations and include the medical/clinical findings that support this assessment." (Tr. 457-58). Plaintiff argues that because Dr. Bowers was one of Plaintiff's treating physicians, his MSS should have been given controlling weight. The Court disagrees.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(c)(2)). However, "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." *Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted). "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*,

8

501 F.3d 987, 990 (8th Cir. 2007)). If a treating physician's opinion is not given controlling weight, the amount of weight given to it "is to be governed by a number of factors [contained in 20 C.F.R. §§ 404.1527(c) & 416.927(c)] including the examining relationship, the treatment relationship, consistency, specialization, and other factors." *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003) (citations omitted). In weighing a treating source opinion, it is the ALJ's duty to resolve conflicts in the evidence, and the ALJ's finding in that regard should not be disturbed so long as it falls within the "available zone of choice." *E.g.*, *Hacker v. Barnhart*, 459 F.3d 934, 936-38 (8th Cir. 2006).

Here, the ALJ gave several good reasons for discounting Dr. Bowers' opinion. Those reasons were supported by substantial evidence and place the ALJ's decision within the available zone of choice. The ALJ first explained that he found Dr. Bowers' MSS to "stand alone with limitations not mentioned in his numerous records of treatment . . . ." (Tr. 22). *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (affirming the ALJ's decision to discount the opinion of a treating physician where it contained limitations that "stand alone" and "were never mentioned in [the physician's] numerous records of treatment . . ."). Specifically, the ALJ noted that the mental status examinations given by Dr. Bowers to Plaintiff at each visit had "revealed some abnormalities in mood, affect, and hygiene, but were otherwise unremarkable," and were thus inconsistent with the extreme limitations in the MSS. (Tr. 22). These mental status examinations consistently revealed that, although Plaintiff sometimes had poor grooming and/or hygiene (Tr. 403, 454, 468), detached, anxious, or irritable mood (Tr. 403, 399, 460), and blunted or restricted affect (Tr. 403, 454), Plaintiff was also generally "alert and oriented," "cooperative," had "goal-directed thought," had intact insight and judgment, and made good eye contact. (Tr. 393-94, 399, 403, 454, 460, 468). The ALJ's finding that the mental status examinations contained in Dr.

9

Bowers' treatment records were inconsistent with the severe limitations set forth in his MSS was a permissible reason to give the MSS less weight. *See Halverson*, 600 F.3d at 930 (ALJ appropriately discounted treating doctor's limitations when they were inconsistent with the plaintiff's mental status examinations); *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes").

Furthermore, the ALJ noted that the severe limitations in Dr. Bowers' MSS were inconsistent with the Global Assessment of Functioning (GAF) score of 65 that he assigned to Plaintiff on all but her first visit.[3] (Tr. 399, 393, 454, 460, 468). A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* 32. As the ALJ noted, Dr. Bowers assigned Plaintiff a GAF score of 65 at an appointment in the same month that he issued the MSS, (Tr. 22, 460), as well as at her previous and subsequent appointments. (Tr. 22, 454, 468). The fact that Plaintiff's history of GAF scores indicated only mild symptoms or some difficulty in social or occupational functioning, while not dispositive, supports the ALJ's conclusion that the extreme limitations in Dr. Bowers' MSS were inconsistent with his treatment notes and Plaintiff's medical record as a whole. *See Goff*, 421 F.3d at 791 (GAF score of 58 indicating moderate symptoms was substantial evidence supporting ALJ's decision not to give controlling weight to treating psychiatrist's opinion);

---

[3] The GAF Scale is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). Dr. Bowers gave Plaintiff a GAF score of 60 on her first visit. (Tr. 403).

*Halverson*, 600 F.3d at 931 (ALJ did not err in failing to give controlling weight to treating psychiatrist's opinion when it conflicted with the claimant's history of GAF scores between 52 and 60, which indicated moderate symptoms or moderate difficulty in social or occupational functioning).

The ALJ also noted that the limitations in Dr. Bowers' MSS were inconsistent with his "generally conservative" pattern of treatment. (Tr. 22). Plaintiff's course of treatment with Dr. Bowers consisted solely of medication and follow-up visits, and the prescribed medications remained fairly stable.[4] (Tr. 403, 399, 393, 454, 460, 468). Apart from a period of observation after her first pseudoseizure (Tr. 320), Plaintiff has not been hospitalized. (Tr. 19). Furthermore, the frequency of Plaintiff's treatment with Dr. Bowers has decreased: while she saw Dr. Bowers monthly in the Spring of 2011 (Tr. 401, 398, 392), by late 2011 and 2012 she was seeing him for follow-ups only once every few months. (Tr. 454, 460, 468). The inconsistency between Plaintiff's generally conservative course of treatment further supports the ALJ's decision to give Dr. Bowers' opinion "little weight." *See Perkins v. Astrue*, 648 F.3d 892, 898-99 (8th Cir. 2011) (finding the ALJ properly discounted a Medical Source Statement in part because the claimant had received only conservative treatments).

The ALJ also indicated that he gave less weight to the MSS because it was a standardized, check-the-box form in which Dr. Bowers failed to include supporting reasoning or clinical findings. (Tr. 22). Even though the MSS form provided several spaces for

---

[4] For example, Dr. Bowers prescribed Plaintiff 40 mg of the antidepressant citalopram at her initial appointment in April 2011; at her last appointment before the ALJ hearing in November 2012, her citalopram dosage was still 40 mg. (Tr. 403, 468). In addition to an antidepressant, Dr. Bowers has only prescribed Ambien (a sleep aid), and clonazepam (a drug that may be used to treat epilepsy, panic disorder, and anxiety). (Tr. 468). Plaintiff's clonazepam was increased once to make her sleep more restful. (Tr. 460). Plaintiff did have a sleep medication (trazodone) discontinued, but apparently only because it was causing her to sleepwalk. (Tr. 393).

"medical/clinical findings that support this assessment," Dr. Bowers left all of those spaces blank. (Tr. 457-58). The fact that Dr. Bowers failed to provide supporting medical evidence or to elaborate on his conclusions was another permissible ground for the ALJ to reduce the weight given to the MSS. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) ("[W]e have recognized that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration'" (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2009)); *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) ("[T]he ALJ may give a treating doctor's opinion limited weight if it provides conclusory statements only . . ."); *McCoy*, 648 F.3d at 615-16 (ALJ properly gave medical opinion less weight in part because it was in a "checklist format" and the space in which the doctor was asked to "explain how and why the evidence supports your conclusions" was left blank).

The ALJ's decision to give little weight to the extreme limitations in Dr. Bowers' opinion was also supported by the ALJ's thorough credibility analysis, which included findings that Plaintiff's self-reported daily activities were somewhat inconsistent with her allegations of disabling mental symptoms (Tr. 16, 20-21, 51-52, 220-25), that Plaintiff had received only conservative and intermittent treatment for her symptoms (Tr. 19, 22); and that Plaintiff had reported that her medications were helping her symptoms. (Tr. 19, 251, 292, 403, 453). *See Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) (upholding an ALJ's credibility determination based in part on a claimant's "failure to diligently seek medical care"); *Bernard v. Colvin*, 774 F.3d 482, 489 (8th Cir. 2014) ("'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'") (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)).

Finally, although the ALJ did not explicitly discuss all of the factors listed in §§ 404.1527(c) and 416.927(c) in evaluating Dr. Bowers' opinion, he was not required to do so. *See Nishke v. Astrue*, 878 F. Supp. 2d 958, 984 (E.D. Mo. 2012) (ALJ's failure to perform a factor-by-factor analysis of the 20 C.F.R. §§ 404.1527(c) and 416.927(c) factors was not erroneous when the ALJ "explained his rationale in a manner that allowed the [Court] to follow his line of reasoning"); *Derda v. Astrue*, No. 4:09-CV-01847 AGF, 2011 WL 1304909, at *10 (E.D. Mo. Mar. 30, 2011) ("While an ALJ must consider all of the factors set forth in 20 C.F.R. § 404.1527[c], he need not explicitly address each of the factors"). The ALJ cited 20 CFR §§ 404.1527 and 416.927 in his discussion and discussed several of the factors, including the consistency of Dr. Bowers' opinion with the record as a whole, the supportability of the MSS, and the fact that Dr. Bowers was a psychiatrist. (Tr. 22). The ALJ also "explained his rationale in a manner that allows the [Court] to follow his line of reasoning" *Nishke*, 878 F. Supp. 2d at 984. No more was required to comply with the relevant regulations.

**VI. CONCLUSION**

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of June, 2015.